1998 ME 256

**CONSERVATORSHIP OF Raynold JACKSON Sr.**

Supreme Judicial Court of Maine.

Argued Nov. 2, 1998.
Decided Dec. 4, 1998.

Andrew Ketterer, Attorney General, Carmen L. Coulombe, Asst. Atty. Gen. (orally), Augusta, for Dept. of Human Services.

Robert E. Miller (orally), Spencer, Zmistowski & Miller, Old Town, for William Jackson.

Julio V. DeSanctis, III (orally), Downeast Law Associates, P.A., Orrington, for Rita Freese and Bruce, Raynold Jr., and Richard Jackson.

Before WATHEN, C.J., and CLIFFORD, DANA, SAUFLEY, ALEXANDER and CALKINS, JJ.

CALKINS, J.

[¶ 1] The Department of Human Services (DHS) and William Jackson appeal from a decision of the Penobscot County Probate Court (*Woodcock, J.*) denying DHS's petition to terminate its conservatorship of Raynold Jackson Sr.; disallowing DHS's accounting; and rescinding a deed transferred by DHS on behalf of Raynold Jackson Sr. to William. We vacate the decision.

[¶ 2] DHS was appointed public guardian of Raynold Jackson Sr. in October 1991. Jackson Sr., who was seventy-six years old, lived at a nursing home in Bar Harbor. He was unable to walk and nearly blind. The left side of his body was paralyzed due to a stroke, and he suffered from dizzy spells. He wanted to return to his home in Olamon, but he could no longer care for himself. His family was divided over the care he should receive.

[¶ 3] Before his admission to the nursing home, Jackson Sr. lived in his home in Olamon with his disabled son, William. Jackson Sr.'s only significant asset was the home, worth $22,400. After Jackson Sr. moved to the nursing home, William continued to live at the Olamon property. Due to his disability, William's only income was from Supplemental Security benefits.

[¶ 4] Jackson Sr. was unable to pay for the maintenance of his home, including the taxes. His only income was a monthly Social Security check, and all but $40 went toward the cost of the nursing care, which was supplemented by Medicaid funds. Because Jackson Sr. could not afford to keep his home and because he was unable to make decisions regarding the disposition of this property, DHS sought to become his conservator.

[¶ 5] With the petition for appointment of conservator, DHS filed a conservatorship plan stating that the major asset of Jackson Sr.'s estate was the Olamon property and that a conservator was needed to make decisions about the disposition of it. Both the petition and the plan were served on all seven of Jackson Sr.'s children. The Probate Court held a hearing on the conservatorship petition in June 1992. A DHS caseworker testified that because Jackson Sr. would be unable to return to his home, DHS intended to deed the Olamon property to William, retaining a life estate for Jackson Sr. The caseworker and Jackson Sr.'s attorney confirmed that it was Jackson Sr.'s desire that the home go to William. Of the children, Steven Jackson was the only one who appeared at the hearing, and he said that he did not object to the plan. On July 14, 1992, the Probate Court appointed DHS as Jackson Sr.'s public conservator without limitation.

[¶ 6] After consulting with Medicaid officials, DHS decided that retaining a life estate for Jackson Sr. could make him ineligible for Medicaid because it would have value as an asset. Jackson Sr. could retain only $2,000 in assets and still remain eligible for Medicaid benefits, which constituted a substantial part of the nursing home care. DHS discussed alternatives with Medicaid officials. Selling the house outright would make Jackson Sr. ineligible for Medicaid, and he would have to use the proceeds from the sale for his nursing home care until he had spent all but $2,000. Renting the house was not a viable option because the rental income would be counted as income to be applied to the nursing home care and there would be no income from which the expenses of the house could be paid. Medicaid officials acknowledged that the regulations permit a conveyance to a disabled adult child without counting the value of the asset conveyed against the grantor. In December 1992, DHS, as conservator, transferred the Olamon property to William. DHS conveyed the property to William without reservation because it was Jackson Sr.'s desire that the home go to William; because

Jackson Sr.'s health was such that he could not return to the home; and because Medicaid eligibility would be compromised if Jackson Sr. retained an interest in the home. Jackson Sr. died in October 1993. William continued to live on the Olamon property, and in June 1995, he sold an acre of it.

[¶ 7] In early 1997, DHS filed its First and Final Account, Inventory, and Petition for Termination of Conservatorship regarding Jackson Sr.'s estate. Prior to the hearing, two of the children, Bruce Jackson and Raynold Jackson Jr., filed written objections to DHS's petition and accounting, alleging only that DHS failed to account for their father's interest in property located in Bradley.[1] They later filed objections to the conveyance to William as an unauthorized gift.

[¶ 8] At the hearing on April 29, 1997, five of Jackson Sr.'s children appeared but none presented evidence. Bruce Jackson stated that none of the heirs wanted to prevent William from living in the house, but someone else should have been appointed to watch over the property. The Probate Court denied the request to terminate the conservatorship, disallowed the accounting, and declared the deed to William void. The court concluded that DHS exceeded its authority by conveying the Olamon property to William as a gift. In response to post-judgment motions, the Probate Court reaffirmed its decision. DHS and William appealed, and four of the heirs responded to the appeal.

[¶ 9] DHS argues that the heirs are barred by laches from objecting to the conveyance of the Olamon property to William. Laches is not merely delay, but delay that is prejudicial to the adverse party. Dow v. Adams, 1998 ME 48, ¶ 13, n. 3, 707 A.2d 793, 796 n. 3. DHS contends that the heirs' delay in objecting to the conveyance meant that it might have to defend an action for surcharge by the heirs or possibly defend an action for damages from William. These possible lawsuits, however, were equally likely on the day DHS conveyed the property to William as they are today. It is the authority for the conveyance that determines wheth-

er DHS would be liable. The delay in objecting to the conveyance has no bearing on the potential liability of DHS. DHS has failed to demonstrate that any delay by the heirs prejudiced DHS. Although William may have been prejudiced by the delay because he sold a portion of the property in reliance on a valid deed, he does not join DHS in arguing this point on appeal. We conclude that laches does not bar the objection of the heirs.

[¶ 10] In denying the petition to terminate the conservatorship and disallowing the accounting, the Probate Court concluded DHS exceeded its authority as conservator by transferring the Olamon property as a gift. We conclude that DHS had the authority to convey the Olamon home to William. The authority for the conveyance of the property is found in the broad statutory powers of a conservator to expend or distribute the income and principal of an estate for the care and benefit of the protected person. 18-A M.R.S.A. § 5-425(a)(1998). In acting for the protected person's care and benefit, the conservator is to have due regard for other funds and sources that can be used to support the protected person. *Id.* at § 5-425(a)(2). In this situation, Medicaid eligibility was of primary concern. Further, Jackson Sr. himself wanted the property to go to William, a fact the conservator is required to consider pursuant to 18-A M.R.S.A. § 5-427 (1998).

[¶ 11] The authority for the conveyance also comes from the fact that the appointment of DHS as conservator was without limitation and with the knowledge of the court that the purpose of the conservatorship was to dispose of the home. The conservatorship plan states that the reason a conservator is needed is to make a decision about the disposition of the property. The DHS agent testified that DHS intended to convey the property to William subject to a life estate in Jackson Sr.

[¶ 12] The heirs argue that the conveyance to William was in violation of either section 5-408(4) or 5-425(b) of the Probate

---

1. The DHS financial analyst testified that DHS investigated the claim to property in Bradley, but found that Jackson Sr. was not a property holder there. The Probate Court made no findings on this issue, and it has not been raised on appeal.

Code. Section 5–408(4) provides that the court, directly or through a conservator, has the authority to make a gift which exceeds 20% of a year's income of the estate, after notice and hearing, if the gift is in the protected person's best interest and the person has consented or is incapable of consenting. 18–A M.R.S.A. § 5–408(4)(1998). Section 5–425(b) is similar. Assuming, without deciding that the conveyance to William was a gift, we conclude that when the Probate Court appointed DHS conservator without limitation, it authorized DHS to convey the estate. Although DHS did not make the exact conveyance it proposed and instead conveyed the entire estate to William, for all intents and purposes the conveyance was as planned in light of Jackson Sr.'s death less than a year after the conveyance and his inability during his lifetime to return home. DHS was warranted in conveying the property without the life estate when it learned from Medicaid officials that the value of a life estate would have a bearing on Jackson Sr.'s Medicaid eligibility.

[¶ 13] In *Estate of Paine*, 609 A.2d 1150, 1152 (Me.1992) we stated: "where ... there are no restrictions stated in the appointment, the conservator has broad powers of management that may be exercised without court order, including the ability to distribute and end the arrangement without court order if he can meet the terms of the Code." In this case the terms of the Code were met because the court knew that the purpose of the conservatorship was the disposition of the home. The conveyance achieved the purpose for which DHS was appointed.

The entry is:

Judgment vacated. Remanded for further proceedings consistent with this opinion.

